# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 9, 2016 Session

## NATHAN Z. VINSON v. KRISTIN DENISE BALL ET AL.

**Appeal from the Juvenile Court for Cumberland County**
**No. 09-JV-1092     Larry M. Warner, Judge**

_____

**No. E2015-01856-COA-R3-JV-FILED-NOVEMBER 9, 2016**

_____

This is a child custody action involving two minor children.  In 2010, the biological parents of the children entered into an agreed order, which provided that the mother would be the primary residential custodian with the father enjoying visitation rights.  Thereafter, the mother sent the children to live with their maternal grandfather.  In July 2014, the father filed a petition seeking to modify the prior custody order and establish a permanent parenting plan wherein he would be designated the primary residential parent.  The mother opposed this change, and the maternal grandfather sought to intervene in the action for the purpose of seeking custody of the children.  The trial court awarded primary custody to the maternal grandfather, determining that a risk of substantial harm would result if custody of the children were awarded to the father.  The father has appealed.  Determining that there is a lack of clear and convincing evidence to support the trial court's finding of a risk of substantial harm, we reverse the custody award to the grandfather.  We remand this matter for a hearing regarding whether a material change in circumstance has occurred since the initial custody award and whether modifying the designation of primary residential parent from the mother to the father is in the children's best interest.  We also remand this matter for the trial court to revisit the issue of changing the children's surnames.  We affirm the trial court's denial of the grandfather's request for retroactive child support.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Kelsy A. Miller, Cookeville, Tennessee, for the appellant, Nathan Z. Vinson.

G. Earl Patton, Crossville, Tennessee, for the appellees, Kristin Denise Ball and Richard Smith.

**OPINION**

## I. Factual and Procedural Background

Petitioner, Nathan Z. Vinson ("Father"), is the biological father of two minor children, A.S. and K.S. ("the Children"), who were eight and nine years of age, respectively, at the time of trial. Kristen Denise Ball, formerly known as Kristen Smith ("Mother"), is the biological mother of the Children. Father and Mother cohabitated for a short period of time in Tennessee following the Children's births but separated when Father returned to his family home in Louisiana. In 2009, the Cumberland County Juvenile Court awarded Father temporary custody of the Children for a period of seven or eight months while Mother was incarcerated. Subsequently, on March 24, 2010, the Cumberland County Juvenile Court entered an "Order Establishing Parentage," which confirmed Father's paternity of the Children. In that order, Mother was named primary residential parent, and Father was granted visitation with the Children for the entire month of June every year, one weekend per month, and alternating holidays. The order provided that the issue of child support would be reserved "pending action by the Department of Human Services." The order also provided that Father would be responsible for changing the Children's surnames from "Smith" to "Vinson" and that Mother would cooperate with this endeavor.

It is undisputed that spanning the next three years, the Children moved "back and forth" between Mother's home in Tennessee and the home of her father, Richard Smith ("Grandfather"), in North Carolina and later South Carolina. Mother admitted that she was financially unable to care for the Children on her own. Father continued to visit with the Children whether the Children were living with Mother or Grandfather, and Father moved to South Carolina for a period to be closer to the Children. Eventually, however, Father returned to his family home in Louisiana. Father paid no support to Mother or Grandfather during this time period, although he did provide for the Children's needs when they were visiting with him.

Father asserted that at some point, Grandfather began denying his requests for visitation. Consequently, Father filed a "Petition to Modify Current Parenting Order and to Establish a Permanent Parenting Plan" on July 16, 2014. Father alleged that he had been unable to maintain contact with Mother and had only recently discovered that Mother had again sent the Children to live with Grandfather without Father's knowledge.

2

Father averred that he had been exercising visitation but did not wish to return the Children to Grandfather's care because Grandfather was not their legal custodian. Father thus contended that there had been a material change in circumstance justifying a change in the designation of primary residential parent from Mother to Father.

Mother and Grandfather jointly filed an answer and counter-petition, seeking to hold Father in contempt for failing to return the Children from a visit, to establish a permanent parenting plan, and to set child support. Grandfather, who had concomitantly filed a motion to intervene, was listed as an "intervening counter-petitioner" on the joint counter-petition.[1] Mother and Grandfather also filed a joint motion seeking immediate return of the Children to Grandfather. In these pleadings, Mother and Grandfather asserted that although Father was supposed to have returned the children to Grandfather on July 15, 2014, Father refused to do so. They also contended that it was in the Children's best interest to remain in the custody of Grandfather. Mother and Grandfather requested that the trial court formalize Grandfather's custody of the Children because he had been their primary caregiver for many years.

The trial court entered an Order on August 8, 2014, reciting that Father had asked for *ex parte* relief to restrain Mother and Grandfather from removing the Children from Father's custody pending a hearing. The court also noted that Grandfather, whom the court referred to as "the Intervening Counter-Petitioner," and Mother had filed an answer and counter-petition as well as a motion seeking the immediate return of the Children to Grandfather. The court stated, *inter alia*, in its order: "The Court denied the ex parte relief requested by the Petitioner and Ordered, sua sponte, that the children be immediately returned to the custody of the Respondent [Mother] and Intervening Counter-Petitioner [Grandfather], pending further hearing to take place on August 15, 2014, at 9:00 a.m." Father subsequently filed pleadings opposing Grandfather's intervention in the case.

The trial court conducted a hearing on August 15, 2014, regarding the countervailing custody petitions. Mother, Father, and Grandfather were the only witnesses. Mother admitted that she was financially unable to care for the Children, which she explained was the reason she sent them to live with Grandfather. Mother acknowledged that she had paid no support to Grandfather during the time of his care for the Children. Mother opined that Grandfather and his wife had done well in caring for the Children, such that she felt it was in the Children's best interest to remain in their custody.

---

[1] Grandfather asserted that he should be allowed to intervene pursuant to either Tennessee Rule of Civil Procedure 24.01 or 24.02.

Father testified that despite his repeatedly asking for custody of the Children since 2010, Mother had refused. Father stated that he had to arrange his visitation through Grandfather a majority of the time. Father characterized Grandfather as initially cooperative but related that Grandfather became less so with time. According to Father, Grandfather had, of late, thwarted his attempts to visit the Children, calling Father a "sperm donor." According to Father, he moved to South Carolina at some point to reside closer to the Children. He eventually returned to Louisiana because he had not been allowed to visit the Children freely and could not obtain lucrative employment in South Carolina.

Father explained that he currently resided with his grandmother at her home in Shreveport, where he had lived most of his life. Father was employed on an oil drilling rig in another state, working and living for fourteen consecutive days away from home and then returning home for fourteen consecutive days off. Father testified that he earned $24 per hour, for a gross income of approximately $60,000 per year. According to Father, he was able to provide for the Children's needs, clarifying that his mother, who lived nearby, and grandmother would care for the Children when he was away for work. Father acknowledged that he had never paid child support, rationalizing that he had never been ordered to do so.

Grandfather testified that he had recently moved to Fort Mill, South Carolina, because of the superior reputation of Fort Mill's school system. According to Grandfather, shortly after the parentage order was entered in 2010, Mother asked him to assume physical custody of the Children, providing him with a "letter of guardianship" so that he could enroll the Children in school. Grandfather stated that he was unaware of Father's address and usually exchanged the Children for visitation by meeting Father's mother or grandmother at a half-way point. Grandfather acknowledged that although Mother had paid no support for the Children, he supported the Children for her as he believed family should.

According to Grandfather, Father had abandoned the Children since their birth. Grandfather asserted that he had attempted to cooperate with Father and give Father as much visitation as he desired, in addition to allowing Father to have telephonic access to the Children. Grandfather acknowledged that he felt "confident" that the Children were well cared for when they were with Father. However, Grandfather related that he had been the one providing the Children with stability throughout most of their lives, describing them as happy and thriving in his care.

During closing arguments, Father's counsel posited that before custody could be awarded to a non-parent, the court was required to make a finding of substantial harm. Upon ruling from the bench, the trial court awarded custody to Grandfather based on a

material change in circumstance. The court awarded Father visitation during the month of June only, with exchange of the Children to occur in Birmingham, Alabama. The court admonished Father to appear on time for the exchange or otherwise face substantial incarceration.

The trial court subsequently entered an order on September 2, 2014, determining that a material change in circumstance had taken place since the 2010 parentage order. The court found that neither parent had provided for or supported the Children appropriately and that the Children were "blessed" to have Mr. Smith as a grandparent. The court accordingly awarded primary custody of the Children to Grandfather. In finding that neither parent had ever been ordered to pay child support, the court imputed minimum wage income to Mother and determined Father's gross income to be $4,032 per month based upon his testimony. Pursuant to the Child Support Guidelines, the court set Mother's child support obligation at $286 per month and Father's child support obligation at $984 per month. The court further ruled that the Children's surnames remain as "Smith."

Mother and Grandfather thereafter filed a joint motion seeking to alter or amend the judgment. In support, they asserted that the trial court had not specifically ruled on the motion to intervene and further had not made specific findings of fact to support the transfer of custody to Grandfather. Mother and Grandfather also complained that the issues of retroactive child support and medical expenses had not been addressed. Meanwhile, Father filed a notice of appeal, which appeal was subsequently dismissed by this Court due to Father's failure to pay the required litigation tax. *See* Tenn. Code Ann. § 67-4-601 (2013), *et seq*.

Upon remand, the trial court conducted a hearing on October 1, 2014, regarding the pending motion to alter or amend. When Grandfather's counsel advised the court that no written order had been entered allowing Grandfather's intervention, the court remarked, "[i]t would appear to me . . . that I cured the motion to intervene when I granted you custody." Grandfather's counsel then proffered that in order to transfer custody to Grandfather as a non-parent, the court was required to make a finding of substantial harm. At the conclusion of the hearing, the court announced:

> Now, we've dealt with the issues of custody, we've dealt with the issues of visitation, I believe, and I think we've also dealt with the issue of current support, leaving us with unpaid medical bills and retroactive child support. I will be very concerned with the time period from the date of the order establishing paternity in 2010, I believe, I'll be concerned with the income of the parties in that time frame. So, we can look at that. And, obviously, patterns of visitation by either parent, any of the parents.

5

When Father's counsel asked the court to clarify that it was granting Grandfather's motion to alter or amend, the court responded affirmatively. Father's counsel then inquired whether the parties needed to conduct discovery only on the issues of retroactive child support and medical bills, to which the court again responded in the affirmative.

Grandfather subsequently filed a petition for contempt on November 24, 2014, regarding Father's alleged non-payment of child support, as well as a motion to compel Father's discovery responses. By agreed order dated June 9, 2015, the trial court set the matter for a final hearing on July 28, 2015. On the day of the hearing, Mother and Grandfather filed a joint motion seeking permission to file an amended answer and counter-petition, in which, for the first time, they alleged that the Children would be subjected to substantial harm if custody were granted to Father.

Upon commencement of the July 28, 2015 hearing, Grandfather's counsel informed the court that the motion to amend had just been filed. Father's counsel argued that the amendment should be denied due to its filing on the day of the final hearing, which had been set for some time. In support, Father's counsel asserted that Father had not been provided proper notice of this claim and an opportunity to prepare a defense. The court stated, "I think what you [Grandfather's counsel] have done here is, you've just memorialized what your proof here in the Court has been submitted . . . ." The court therefore granted filing of the amendment. The court subsequently inquired of Father's counsel whether she wished to seek a continuance. Counsel responded that Father wished to go forward with the hearing. Counsel, however, asked for a clarification of the issues to be addressed, stating that her understanding was that only issues of retroactive child support and medical expenses remained for determination. Grandfather's counsel declared that Grandfather was seeking a determination of substantial harm from the court. The court permitted Grandfather to proceed with the presentation of proof regarding this claim without further objection by Father's counsel.

Grandfather testified that he had recently paid a substantial medical bill resulting from an incident wherein K.S. suffered a broken arm. According to Grandfather, although Father had stated that he would contribute to these medical expenses, he had not done so. Grandfather characterized the Children as "theirs," referring to Grandfather and his wife, by reason of the Children having been in their physical custody for a majority of the Children's lives. Acknowledging that the Children appeared to enjoy spending time with Father and his family, Grandfather added that he knew the Children loved Father and that Father loved them. While Grandfather indicated that he believed the Children were "okay" when they were in Father's care, he expressed displeasure that Father had not paid child support until ordered to do so by the court.

6

Grandfather also admitted that there had been occasions when Father had requested to visit with the Children but Grandfather had refused. Moreover, Grandfather conceded that he left a voicemail message for Father stating that he would do everything in his power to make sure Father never saw the Children. Grandfather explained that he was upset because upon their return from visitation, the Children had articulated that Grandfather wanted a "do-over" because he had not done a good job raising his own children. Grandfather was also disturbed when the Children reported Father's use of a racial slur upon referring to the Children's half-sister. Furthermore, according to Grandfather, Father had offered to add the Children to his medical insurance through his employment but never followed through.

Mother testified that Father demonstrated a bad temper and had physically pushed her while she was pregnant with K.S. She reported that another incident of physical assault had occurred previously. As Mother explained, both incidents happened before she agreed to allow Father to exercise visitation with the Children in the 2010 parentage order.

Father related that although he wanted to maintain custody of the Children in 2010 when the parentage order was entered, the trial court had informed the parties that it would not remove custody from Mother because Mother had made "one mistake." Father testified that Grandfather and his wife worked six days per week, often into the evening hours, such that the Children were frequently left in the care of a babysitter. Father also explained that he was unable to add the Children to his medical insurance coverage because Grandfather refused to send copies of the Children's birth certificates or social security numbers. Father expressed his distress at only having seen the Children one time during the prior year, indicating that he had been denied visitation at Christmas. According to Father, the Children reported that they would be in trouble if they wished to call Father or send him a letter when they were with Grandfather. Father also reported that the Children were extremely sad upon leaving his home to return to Grandfather. Father asserted that should his work schedule be the basis for his not being granted custody, he would find a new full-time job in Louisiana. Concerning allegations of domestic violence, Father explained that when he was residing with Mother, he had not assaulted her; rather, he insisted it was Mother who assaulted him. Father further indicated that the assault incident was the reason he had left and returned to Louisiana.

At the conclusion of the hearing, the trial court determined that no retroactive child support would be awarded and that each parent would be responsible for $7,500 in medical expenses. The court reaffirmed its earlier award of custody to Grandfather, finding that substantial harm to the Children would result if custody were granted to Father. The court noted that if the Children moved to Louisiana with Father, there would be "too many unknowns" because the court did not know who would care for the

Children or where they would go to school. The court also observed that a grant of custody to Father, considering his current work schedule and living situation with his grandmother, would basically be "trading" one grandparent for another. By virtue of the time the Children had resided with Grandfather and the totality of the circumstances, the court determined that the Children should remain in Grandfather's custody.

The trial court subsequently entered an order on September 10, 2015, stating in pertinent part:

> The Court finds that the Petitioner Father lives in Shreveport, Louisiana and that he is employed as a motor man on an oil-drilling rig, and that such work takes him out of town, regularly for two weeks at a time, and that he has to remain out of town and stay at a bunk house during these working periods. Father earns approximately $60,000.00 per year, and when not working, resides in a home owned by his grandmother.

> The Respondent Mother resides in Cookeville, Tennessee and is currently unemployed. The proof showed that she has relied upon the Intervening Petitioner, her father, for support. Respondent mother testified that it was in the best interests of the children to continue residing with her father in Fort Mill, South Carolina. . . .

> The Court finds that [Grandfather] currently lives in Fort Mill, SC, a town to which he moved specifically because of the reputation of the school system there as would relate to the children. Richard Smith has had physical custody of the parties' children, with the parties' full knowledge and consent for a majority of the children's lives, and has received no financial support from either parent, prior to [the] Court's temporary Order in this cause. Despite this, the proof demonstrated that Richard Smith has made great attempts to maintain and encourage a relationship between the children and both parents, regularly traveling great distances to meet the mother and even further distances for the children to meet their father for periods of visitation.

> The Court further finds that legal custody of the children should be granted to the Intervening Petitioner as substantial harm would result to the children in the custody of either of the parents in this case. Specifically, it is noted that the Mother in the case has joined the Intervening Petitioner in advocating for her father as being in the best position to take care of the children. In doing so, she has waived the requirement of a showing of substantial harm as to her. However, the Court also finds that her

testimony supports a finding that the children would be subjected to substantial harm in the custody of the mother, as she has demonstrated a sustained inability to support the children financially and such a pattern of poor choices in her life that the children would be subjected to such harm.

As to the Petitioner Father, prior to the Court's temporary Order in this cause, he had failed to support the children financially other than purchasing necessaries for the brief and sporadic periods of visitation he has exercised. He has never paid any medical expenses for the children, opting consciously to allow [Grandfather] to support the children completely. The Court finds that this sustained abandonment of the children, along with his inability to care for the children while he works away from his home for long periods of time, supports a finding that the children would be subjected to substantial harm in his care as well. The Court finds that Father's work schedule essentially requires the Court to choose between the maternal grandfather and the paternal great-grandmother whom the Father has indicated would care for the children while he was working on the oil rig. The length of time that the children have been with the [m]aternal grandfather in an apparently satisfactory and stable environment weighs heavily in the Court's analysis.

As to the issue of the children's name change, which was addressed in the March 24, 2010 Order, to the effect that it was [Father's] responsibility to change the children's surnames []from Smith to Vinson, the Court finds that due to the fact that [Father] has not in fact acted to change the children's names since that time, that the children are now eight and nine years old, and that the children have been in school, using the surname Smith for five and four years respectively, that it is no longer in the children's best interests for that name change to occur.

Father timely appealed.

## II. Issues Presented

Father presents the following issues for our review, which we have restated slightly:

1.  Whether the trial court erred by allowing Grandfather to intervene in this custody action.

2.    Whether the trial court abused its discretion by awarding primary custody of the Children to Grandfather absent a showing that the Children would be substantially harmed in Father's care.

3.    Whether the trial court erred by ordering that the Children's last name should not be changed despite a previous agreed order mandating the change.

Grandfather and Mother present the following additional issue:

4.    Whether the trial court erred by failing to order retroactive child support.

## III.  Standard of Review

Regarding the standard of review applicable to a child custody determination, this Court has explained:

Our review of this bench trial is *de novo.*  The trial court's findings of fact, however, come to us with a presumption of correctness that we must honor unless the evidence preponderates against those findings.  Tenn. R. App. P. 13(d); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn. 2001).  In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be ignored by us absent clear and convincing evidence against those determinations.  *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).  We review a trial court's judgment determinations of witness credibility with great deference and will not re-evaluate a trial judge's credibility determinations unless they are contradicted by clear and convincing evidence.  *Wells v. Tenn. Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn. 1999).  No presumption of correctness attaches to the trial court's conclusions of law.  *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 744-45 (Tenn. 2002); *Jahn v. Jahn,* 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

As a general rule, decisions regarding custody are within the broad discretion of the trial judge and will not ordinarily be reversed absent some abuse of that discretion.  *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn. 1992); *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988).  Accordingly, a trial court's discretionary judgment will be upheld if the decision is one about which reasonable minds might disagree.  A trial court abuses its discretion when it "applies an incorrect legal standard, or

10

reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999)).

*In re Abigail G.D.H.*, No. E2011-00118-COA-R3-JV, 2011 WL 3209180, at *5-6 (Tenn. Ct. App. July 28, 2011).

## IV. Grandfather's Intervention

Father argues that the trial court should not have been permitted Grandfather to intervene because there was no demonstration of parental unfitness. Mother and Grandfather assert that the trial court appropriately granted intervention because the Children had been in Grandfather's care for a substantial amount of time and Father had failed to support the Children during that timeframe.

The Tennessee Rules of Civil Procedure provide for two types of intervention: intervention as of right and permissive intervention. Intervention as of right is addressed in Tennessee Rule of Civil Procedure 24.01, which states:

> Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties; or (3) by stipulation of all the parties.

Tennessee Rule of Civil Procedure 24.02 addresses permissive intervention, providing:

> Upon timely application anyone may be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising discretion the court shall consider whether or not the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Our thorough review of the record in this matter reveals no order expressly granting Grandfather's motion to intervene or providing a basis for allowing his intervention. Instead, during the October 1, 2014 hearing on the motion to alter or amend, Grandfather's counsel inquired regarding the status of Grandfather's motion to

11

intervene. The judge announced, "It would appear to me . . . that I cured the motion to intervene when I granted you custody." Father contends that neither Tennessee Rule of Civil Procedure 24.01 nor 24.02 would provide a basis for allowing Grandfather to intervene in this custody action because Grandfather was not a parent and had no direct claim of custody that would supersede Mother's or Father's claim. Father asserts that the custody determination should have been made between Mother and Father only.

Grandfather argues that the right of grandparents to permissive intervention in custody cases involving their grandchildren has been established in prior rulings from this Court. *See, e.g., Toms v. Toms*, 209 S.W.3d 76, 80 (Tenn. Ct. App. 2005) (trial court allowed intervention by grandparents when the grandparents alleged in their petition that the parents were not properly caring for the children); *Elmore v. Elmore*, 173 S.W.3d 447, 448 (Tenn. Ct. App. 2004) (trial court allowed intervention by grandparents when the grandparents alleged in their petition that they had been caring for the children for over two years and that the mother had abandoned her responsibilities as a parent); *Dean v. Compton*, No. M1998-00052-COA-R3-CV, 2000 WL 329351, at *14 (Tenn. Ct. App. Mar. 30, 2000) (trial court allowed intervention by grandparents when the grandparents alleged in their petition that both parents had failed to provide for the children, forcing the grandparents to assume that responsibility). *But see In re Marquise T.G.*, No. M2011-00809-COA-R3-JV, 2012 WL 1825766, at *1 (Tenn. Ct. App. May 18, 2012) (holding that although the grandmother was not precluded from seeking custody, the trial court did not err in limiting her intervention to seeking "any visitation rights to which she might have been entitled to under Tenn. Code Ann. § 36-6-306" because her petition failed to allege substantial harm).

We note that "the decision to allow intervention is a matter within the discretion of the trial court. This decision should not be reversed by an appellate court absent a showing of abuse of discretion." *Shelby Cnty. Deputy Sheriff's Ass'n v. Gilless*, 972 S.W.2d 683, 685 (Tenn. Ct. App. 1997). Furthermore, as our Supreme Court has explained:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott,* 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland,* 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn. 1998).

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

In this case, Grandfather's initial petition seeking custody alleged that the Children had been residing with him for some time and that Father had failed to support or regularly visit the Children. Not until the date of the final hearing did Grandfather file an amended counter-petition alleging that the Children would be subjected to substantial harm if custody were granted to Father. Based upon the above-described precedent, however, we determine that the trial court did not abuse its discretion in allowing Grandfather to intervene in this custody dispute because of the allegations contained in his initial petition regarding the parents' failure to support and care for the Children. *See Toms*, 209 S.W.3d at 80.

## V. Award of Custody to Grandfather

Father asserts that the trial court erred in awarding custody to Grandfather because Grandfather and Mother failed to demonstrate by clear and convincing evidence that Father was unfit or that substantial harm would result if the Children were placed in Father's care. Father contends that if Grandfather had not been allowed to intervene, Father's burden of proof would have been to show by a preponderance of the evidence that a material change in circumstance had occurred since the prior custody award to Mother and that a modification was in the Children's best interest. As this Court has previously explained:

> Because Father in his petition to modify the permanent parenting plan requested that he be named the primary residential parent rather than Mother, this action is considered one for modification of "custody." *See Armbrister v. Armbrister,* 414 S.W.3d 685, 703 (Tenn. 2013) (comparing the standard for an action to modify custody to the standard for an action to modify only a residential parenting schedule). Upon a petition to modify custody from one parent to the other parent, "the 'threshold issue' is whether a material change in circumstance has occurred after the initial custody determination." *See Kendrick v. Shoemake,* 90 S.W.3d 566, 570 (Tenn. 2002) (quoting *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002)). Upon a trial court's finding that a material change in circumstance affecting the children has occurred, "it must then be determined whether the modification is in the child[ren]'s best interests." *Kendrick,* 90 S.W.3d at 570 (citing Tenn. Code Ann. § 36-6-106); *see generally Boyer v. Heimermann,* 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007) ("In approaching questions of custody and visitation, the needs of the children are paramount; the desires of the parents are secondary.").

13

Regarding the standard a petitioning parent must meet to prove a material change in circumstance sufficient for consideration of whether custody modification is in the best interest of the child, Tennessee Code Annotated § 36-6-101(a)(2)(B) (2014) provides in relevant part:

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> (i) In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.

*See also Armbrister,* 414 S.W.3d at 703.

*Muhonen v. Muhonen*, No. E2013-02601-COA-R3-CV, 2015 WL 740667, at *5-6 (Tenn. Ct. App. Feb. 20, 2015).

Inasmuch as Grandfather was allowed to intervene and seek custody of the Children, however, the proper analysis is as set forth in *Blair v. Badenhope*, 77 S.W.3d 137, 142 (Tenn. 2002), wherein our Supreme Court explained:

> [I]n a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

The High Court expressly found that a parent would enjoy the presumption of superior parental rights when there was no prior order transferring custody from a parent to a non-parent. *Id.* In this case, because there exists no prior decree[2] granting custody to

---

[2] Mother testified that she sent the Children to live with Grandfather and granted him "power of attorney" with respect to the Children. Grandfather testified that Mother provided him with a "guardianship letter" so that he could enroll the Children in school. The only prior order or decree in the record regarding

Grandfather, he is required to show "by clear and convincing evidence, that granting custody to Father subjected the children to a risk of substantial harm." *Elmore*, 173 S.W.3d at 449.[3] Once such a finding has been made, the court may then proceed to evaluate the custody determination in light of the best interests of the Children. *See Dean*, 2000 WL 329351, at *15.

In the case at bar, the trial court determined that the Children would be subjected to substantial harm if allowed to reside with Father, specifically finding that:

> [P]rior to the Court's temporary Order in this cause, [Father] had failed to support the children financially other than purchasing necessaries for the brief and sporadic periods of visitation he has exercised. He has never paid any medical expenses for the children, opting consciously to allow [Grandfather] to support the children completely. The Court finds that this sustained abandonment of the children, along with his inability to care for the children while he works away from his home for long periods of time, supports a finding that the children would be subjected to substantial harm in his care as well. The Court finds that Father's work schedule essentially requires the Court to choose between the maternal grandfather and the paternal great-grandmother whom the Father has indicated would care for the children while he was working on the oil rig. The length of time that the children have been with the [m]aternal grandfather in an apparently satisfactory and stable environment weighs heavily in the Court's analysis.

Father posits that no clear and convincing evidence supports the trial court's finding of substantial harm. Upon a thorough review of the record, we agree.

---

custody of the Children is the 2010 Order Establishing Parentage, which solely involves Mother and Father.

[3] Pursuant to the Supreme Court's opinion in *Blair*, Father cannot be deprived of custody without receipt of the proper "notice required by due process." *See* 77 S.W.3d at 142. Father contends that he was surprised and ultimately prejudiced by the allegations of substantial harm that were raised on the morning of the July 28, 2015 hearing. The law is well settled, however, that when a party does not request a continuance of the trial date in order to address any new claim or evidence brought forth shortly before the trial, such party cannot complain of prejudice on appeal. *See Matus v. Metro. Gov't of Nashville*, 128 S.W.3d 653, 656 (Tenn. Ct. App. 2003); *Schnider v. Carlisle Corp.*, 65 S.W.3d 619, 621 (Tenn. Ct. App. 2001); *Farmers & Merchants Bank v. Dyersburg Prod. Credit Ass'n*, 728 S.W.2d 10, 19 (Tenn. Ct. App. 1986). The trial court offered Father the opportunity to seek a continuance of the trial date, but Father decided to go forward with the trial. Therefore, Father cannot now complain that he was prejudiced by the trial court's decision to allow amendment of the counter-complaint.

15

Regarding substantial harm, this Court has previously explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child.[FN] These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.
>
>> [FN] This court has observed that a finding of substantial harm to a child includes "a finding of parental unfitness or of dependency and neglect of the child . . . ." *Eason v. Bruce,* No. W2000-01326-COA-R3-CV, 2001 WL 502834, at *2 (Tenn. Ct. App. May 10, 2001) (No Tenn. R. App. P. 11 application filed).

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (additional footnote omitted). This Court further explained regarding custody decisions in general:

> Custody decisions should not be used to punish parents for past misconduct or to award parents for exemplary behavior. The courts understand that persons are able to turn their lives around. Accordingly, custody decisions should focus on the parties' present and anticipated circumstances, and on the parties' current fitness to be custodians of children.
>
> The courts may and should consider past conduct to the extent that it assists in determining a person's current parenting skills or in predicting whether a person will be capable of having custody of a child. However, the consideration of past conduct must be tempered by the realization that the persons competing for custody, like other human beings, have their own virtues and vices. Biological parents are not required to demonstrate they are perfect before they can be granted custody of their children.

*Ray*, 83 S.W.3d at 734 (internal citations omitted).

We note that the procedural posture of the *Ray* case is somewhat similar to the history of this cause. In *Ray*, the parties, Mr. and Ms. Ray, were engaged in an ongoing

divorce action that encompassed a custody dispute regarding the four minor children born during their marriage.  *Id*. at 728.   Mr. Ray was not the biological father of the two youngest children, a set of three-year-old twins, and the biological father of the twins, Mr. Staggs, sought to intervene in the divorce action to seek custody of those children. *Id*.  Mr. Staggs had no prior relationship with the twins because he did not learn that he was their father until approximately one month before he sought intervention.  *Id*. at 729. Following his intervention, Mr. Staggs sought and was granted visitation with the twins, which he began exercising immediately.  *Id*.

Subsequent to a hearing on the custody issue, the *Ray* trial court determined that Ms. Ray was "not a fit and proper person" to have custody of any of the four children. *Id*. at 730.  The court then engaged in a comparative fitness analysis between Mr. Ray and Mr. Staggs with regard to custody of the twins, determining that Mr. Ray was the better choice for custodian.  *Id*.  The court also noted its reluctance to separate the twins from their siblings.  *Id*.  Mr. Staggs thereafter filed a Tennessee Rule of Civil Procedure 59.04 motion.  The trial court subsequently entered an order finding that there was clear and convincing evidence of a risk of substantial harm to the twins if placed in Mr. Staggs's custody, stating:

> [B]ecause of both natural parents' use of drugs, instability in relationships, the natural father's history of family mental illness, lack of father's connection with his family, anger undisputed in natural father . . . natural Father's lack of interest in trying to determine paternity until the children were almost two years old, Father's taking no part in the young children's formative years and leaving them to fend for themselves, and Father failing to pay adequate support even after he learned he was the Father . . . ."

*Id*.  The court thus ruled that the children would remain with Mr. Ray, who was "the only stable force in their li[ves]."  *Id*.

On appeal in *Ray*, this Court reviewed the trial court's findings of fact with a presumption of correctness, *see* Tenn. R. App. P. 13(d), but determined that the facts found by the trial court did not clearly and convincingly establish that the twins would be exposed to a risk of substantial harm if placed in the custody of Mr. Staggs.  *Id*. at 733-34.  Reviewing each individual factual finding in detail, this Court determined that the evidence failed to attain the level of clear and convincing.  *Id*. at 734-38.  For example, this Court determined that Mr. Staggs had not demonstrated a "lack of interest in trying to determine paternity until the children were almost two years old," nor had he consciously "[taken] no part in the young children's formative years and [left] them to fend for themselves" because the evidence demonstrated that Mr. Staggs had attempted to call Ms. Ray while she had changed her phone number and that he had also attempted

unsuccessfully to locate her through mutual friends. *Id*. at 735. This Court noted that upon learning of his children's existence, Mr. Staggs immediately sought to intervene in the Rays' divorce to obtain visitation and seek custody. *Id*. This Court also noted that Mr. Staggs had successfully established a relationship with the twins by exercising continuing visitation. *Id*.

With regard to the *Ray* trial court's factual findings involving Mr. Staggs's past and personal relationships, this Court noted that Mr. Staggs had demonstrated positive change in his life by discontinuing his past use of cigarettes and illegal drugs, as well as enjoying a stable and positive relationship with his wife. *Id*. at 736. This Court determined the evidence regarding Mr. Staggs's alleged "anger" to be "anecdotal and unremarkable." *Id*. This Court also determined that there was no evidence that Mr. Staggs suffered from mental illness or that his estrangement from certain family members would affect his parenting ability. *Id*. Rather, this Court determined that the evidence of Mr. Staggs's current fitness to be custodian was more convincing, including the following:

> Mr. Staggs had held a well-paying job for over eighteen months and had earned the trust and respect of his employer. He [had] also been married to a woman he had been dating for approximately eighteen months, and he had been fully integrated into her family. He had earned the admiration and respect of his wife's parents for his honesty and tenacity. He had also gained experience with young children and was serving as a volunteer coach for a YMCA youth basketball program. In light of this evidence, we find that the trial court placed undue weight on Mr. Staggs's past conduct rather than on his current fitness to have custody of his children.

*Id.* at 737. This Court thereby vacated the trial court's order regarding custody and remanded the matter for further hearing on the issue of whether Mr. Staggs's <u>current</u> situation would expose the twins to substantial harm if Mr. Staggs were granted custody. *Id*. at 738.

Similarly, in *Elmore*, the maternal grandparents and aunt intervened in a custody dispute between the father and the mother, alleging that the maternal grandparents and aunt had been the primary physical custodians of the children for over two years. *See Elmore*, 173 S.W.3d at 448. The mother's family further alleged that the mother had abandoned her responsibilities as a parent to the children. *Id*. Without making a finding of substantial harm, the trial court awarded custody of the children to the maternal grandparents and aunt instead of to the mother or father. *Id*.

On appeal in *Elmore*, this Court noted that although the trial court had made no finding of substantial harm, this Court could review the evidence presented at trial by both the father and the mother's family to determine if clear and convincing evidence supported a finding of risk of substantial harm. *Id*. at 450. The maternal grandmother had testified that she did not believe the father was capable of caring for three children while working. *Id*. She also testified that she had never been to the father's home and had no knowledge of whether it was suitable. *Id*. The mother testified that the father had been physically abusive to her prior to their divorce, although she acknowledged that she had been charged with assault, theft, and drug possession; had suffered from drug addiction; and had given false answers to interrogatories. *Id*.

The father in *Elmore* admitted that he had failed to visit with the children for six months, explaining that he was trying to "catch" the mother in unwholesome behavior. *Id*. at 451. The father also acknowledged that he had fallen behind on his child support payments, resulting in the garnishment of his wages. *Id*. This Court noted that although the father lived in a trailer with only two bedrooms, he had testified that he was prepared and able to move to a three-bedroom trailer if granted custody. *Id*. While determining that the father had exercised "poor judgment" in his failure to visit in order to gain a tactical advantage in the custody dispute, this Court concluded that no clear and convincing evidence demonstrated that the children would be subjected to substantial harm if custody were granted to the father. *Id*. This Court therefore reversed the custody award to the maternal grandparents and aunt and designated the father as the primary residential parent of the three children based on his superior constitutional right to their care and custody. *Id*.

In the case at bar, the trial court primarily focused its substantial harm analysis on Father's past lack of child support payments prior to the court's order requiring such child support payments. While noting that Father did provide for the Children's needs during their visits with him, the trial court determined that Father "opted" to allow Grandfather to support the Children. The court found that this "abandonment" by Father, coupled with his work schedule, resulted in a determination that the Children would be subjected to a risk of substantial harm if placed in Father's custody.[4]

With regard to child support, Father stated that he had never been ordered to pay child support and had never been contacted by the Department of Human Services regarding support. Although there is no prior order requiring Father to pay child support,

---

[4] The trial court also declared that "[t]he length of time that the children have been with the [m]aternal grandfather in an apparently satisfactory and stable environment weighs heavily in the Court's analysis." We note, however, that "[e]vidence that [a child] will be harmed from a change in custody because she has lived and bonded with [non-parents] cannot constitute the substantial harm required to prevent the parents from regaining custody." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 812 (Tenn. 2007).

"[a] parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." *See In re Jacobe M.J.,* 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (quoting Tenn. Code Ann. § 36-1-102(1)(H)). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." *Id.*

Father also testified, however, that he had repeatedly asked Mother to allow him to have custody of the Children through the years so that he could take care of them and provide for their needs. Father stated that Mother instead chose to send the Children to live with Grandfather, at times without Father's knowledge.[5] Father testified that he earned an income of approximately $60,000 per year and was capable of providing for all of the Children's needs. Furthermore, it is undisputed that Father provided for the needs of the Children during their visits with him, some of which lasted longer than one month. Grandfather acknowledged that he felt "confident" that the Children were well cared for when they were with Father. Father also testified that he purchased clothing, toys, and gifts for the Children that Grandfather refused to allow the Children to take to Grandfather's home.

Father admitted that part of his reluctance to pay child support to Grandfather was because Grandfather thwarted his attempts to visit the Children and referred to Father as a "sperm donor." During his testimony, Grandfather acknowledged that there had been times when Father had asked to see the Children but Grandfather refused his requests. Although Grandfather's behavior does not justify Father's non-payment of child support,[6] it does negate Grandfather's and Mother's assertions that Father "abandoned" the Children or would fail to support the Children if they were in his custody. Father has demonstrated through the years that he is competent to provide for the Children while they are in his care. Father has also demonstrated a consistent desire to spend time with the Children when allowed to do so. Thus, Father's past failure to pay child support, standing alone, is insufficient to establish substantial harm.

With regard to Father's work schedule, the trial court stated that Father's two-week-on, two-week-off schedule "essentially requires the Court to choose between the maternal grandfather and the paternal great-grandmother whom the Father has indicated would care for the children while he was working on the oil rig." The court made this

---

[5] Father reported that when Mother returned the Children to Grandfather's physical custody in April 2014, Father was not informed and was unable to locate Mother or the Children until he contacted the local sheriff's department.

[6] "Under well-recognized principles of Tennessee law, the obligation of support and the right of visitation are *both* intended for the benefit of the child, and the two are not interdependent." *Rutledge v. Barrett*, 802 S.W.2d 604, 607 (Tenn. 1991).

finding despite Father's testimony that he was willing to seek full-time employment in Louisiana if the Children were placed in his care and despite the substantial support system that Father and the Children would enjoy due to the presence of the paternal grandmother and great-grandmother. Grandfather acknowledged that he related well to Father's family and offered no concerns about their influence on the Children. Grandfather also admitted that the Children always enjoyed their co-parenting time with Father and his family. We therefore determine that a finding of substantial harm is not supported by clear and convincing evidence.

Furthermore, Father testified that he had excellent medical and dental insurance through his employer that would be available to the Children. Father stated that although he had attempted to have the Children added to his medical insurance coverage, he was unable inasmuch as Grandfather would not provide copies of the Children's birth certificates. Father testified that while he was prepared to purchase a home for himself and the Children, his grandmother's home provided plenty of room for everyone in the meantime. According to Father, he and the Children maintained a strong bond and the Children became extremely upset when it was time to leave him. Father also testified that Grandfather limited his contact with the Children via telephone and that the Children reported that they would "get in trouble" if they asked to call Father or send him mail. It was undisputed that in recent years, Grandfather refused Father's requests for additional visitation, even though Grandfather acknowledged that Father loved the Children and that the Children loved Father and enjoyed their time with him.

It is also noteworthy that Mother and Grandfather presented no evidence regarding any history of drug abuse, alcohol abuse, or criminal behavior by Father. At the final hearing, Mother testified that Father had physically pushed her when she was pregnant with K.S. and committed some other prior act of assault. Father testified, however, that it was actually Mother who assaulted him, which precipitated his leaving Tennessee and returning to Louisiana. Mother acknowledged that she had been charged with domestic assault approximately three years before trial. The trial court made no findings regarding this testimony. Rather, the court focused its analysis on Father's past nonpayment of support and his employment schedule.

Based on the totality of the evidence, we determine that Mother and Grandfather did not clearly and convincingly establish that the Children would be exposed to a risk of substantial harm if they were placed in Father's care. *See Elmore*, 173 S.W.3d at 451; *Ray*, 83 S.W.3d at 736-738. We conclude that the trial court erred by granting primary custody of the Children to Grandfather, who is a non-parent. We therefore reverse the trial court's award of custody to Grandfather and remand this matter for a hearing regarding whether a material change in circumstance has occurred since the initial custody award and whether modifying the designation of primary residential parent from

Mother to Father is in the Children's best interest. *See Muhonen*, 2015 WL 740667, at *5-6. The court should also establish an appropriate permanent parenting plan, to include the proper amount of child support to be awarded pursuant to the applicable guidelines, such child support issue having been reserved in the 2010 "Order Establishing Parentage."

## VI. Name Change

Father asserts that the trial court erred by refusing to change the Children's surnames from "Smith" to "Vinson" in accordance with the earlier parentage order. Father relies upon the doctrine of collateral estoppel, arguing that the earlier order had become final prior to the instant proceedings. Mother and Grandfather assert that the parentage order upon which Father relies merely provided that Father could change the Children's surnames, which task Father failed to accomplish. We note that inasmuch as the 2010 parentage order reserved the issue of child support, it was not a final order. *See* Tenn. R. App. P. 3(a); *In re Estate of Henderson,* 121 S.W.3d 643, 645 (Tenn. 2003) (explaining that a final judgment is "one that resolves all the issues in the case, 'leaving nothing else for the trial court to do.'") (quoting *State ex rel. McAllister v. Goode,* 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997)). Therefore, the doctrine of collateral estoppel does not apply. *See Glass v. SunTrust Bank*, No. W2010-02527-COA-R3-CV, 2011 WL 3793495, at *1 (Tenn. Ct. App. Aug. 26, 2011).

Mother and Grandfather further posit that a court should not change a child's surname unless such change promotes the child's best interest. *See Halloran v. Kostka*, 778 S.W.2d 454, 456 (Tenn. Ct. App. 1988) ("[I]n making a decision such as this that will impact on a child's life, paramount consideration must be given to what is in the best interest of the child, and the rights of the parents must yield to that concern."). Although the trial court in its final order briefly addressed the best interest of the Children with regard to changing their surnames, we determine that this issue should be revisited by the trial court upon remand in connection with the court's analysis of whether a material change in circumstance has occurred. We therefore vacate the trial court's determination regarding changing the Children's surnames and remand this issue for further hearing, including presentation of proof regarding the best interest of the Children relative to this issue.

## VII. Retroactive Child Support

Finally, Grandfather argues that the trial court erred by failing to order Father to pay retroactive child support. Although Grandfather sought retroactive support in his pleadings, the trial court specifically found in its final order that no retroactive support would be awarded. Based upon this Court's reversal of the award of custody to

Grandfather, we affirm the trial court's denial of an award of retroactive child support to Grandfather. We conclude that it would be inappropriate to award Grandfather retroactive child support in this instance.

## VIII. Conclusion

For the foregoing reasons, we reverse the trial court's award of primary custody of the Children to Grandfather. We remand this matter for a hearing regarding whether a material change in circumstance has occurred since the initial custody award and whether modifying the designation of primary residential parent from Mother to Father is in the Children's best interest. Upon remand, the court should also establish an appropriate permanent parenting plan, to include the proper amount of child support to be awarded pursuant to the applicable guidelines, such child support issue having been reserved in the 2010 "Order Establishing Parentage." We also remand for reconsideration of whether it is in the best interest of the Children to change their surnames. We affirm the denial of retroactive child support to Grandfather. This matter is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are assessed to the appellee, Richard Smith.

_____
THOMAS R. FRIERSON, II, JUDGE