**FARMERS & MERCHANTS BANK and Linus A. Thornton and wife, Donna Sue Thornton and Robert Reed Thornton and wife, Juanita V. Thornton, Plaintiffs-Appellants,**

v.

**DYERSBURG PRODUCTION CREDIT ASSOCIATION, Defendant-Appellee.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Nov. 14, 1986.

Application for Permission to Appeal Rehearing Denied Feb. 2, 1987.

Albert B. Merkel, Michael T. Tabor, Jackson, for plaintiffs-appellants.

Jerry R. Maxwell, Walter C. Drake, Dyer, for defendant-appellee.

CRAWFORD, Judge.

This appeal involves questions of priority of lien and commercially reasonable sale under the Uniform Commercial Code. Farmers & Merchants Bank (hereinafter Bank) filed its complaint on January 18, 1985, against Dyersburg Production Credit Association (PCA) seeking an injunction to prohibit PCA's proceeding with a sale of certain items of personal property on which Bank claimed a lien superior to PCA's. The sale scheduled for January 18, 1985, involved the property of Linus Thornton and wife, Donna Thornton, and Robert R. Thornton and wife, Juanita Thornton, (hereinafter Thorntons) on which PCA held a security interest. The Bank's complaint alleged that Bank had a superior lien on certain beef cattle, calves, bulls, a ditch bank mower, two cotton pickers, a 24–foot gooseneck stock trailer, and other miscellaneous items and that PCA should be enjoined from selling these items until the priority of security interests can be determined by the court. Based on the sworn allegations of the complaint, a restraining order was issued on January 18, 1985, prohibiting PCA from proceeding with the sale of the items claimed by Bank.

PCA subsequently filed an answer joining issue on the allegations and affirmatively pleading that a Chapter 11 proceeding in the U.S. Bankruptcy Court involving the Thorntons deprived the chancery court of jurisdiction. PCA also filed a counterclaim against Bank alleging PCA's priority to the items claimed and alleges that Bank wrongfully obtained the restraining order causing damage to PCA. At the same time PCA also filed a motion to dissolve the restraining order.

Bank answered the counter-complaint denying the material allegations and asserting the priority it claimed and averred that the stay by virtue of the bankruptcy proceeding was lifted by the bankruptcy court.

On July 19, 1985, the Thorntons filed a motion to intervene and in the intervening complaint alleged that the bankruptcy court lifted its stay allowing the parties to proceed with foreclosure, that they had an agreement with PCA to care for and maintain said livestock and they were due compensation pursuant to the agreement. The complaint further averred that the bankruptcy court awarded compensation for the care and maintenance of the cattle but referred the issues of method of payment, amount due, and party liable to the appropriate state court. They allege they should be compensated for the services at the rate of $50 per day and seek judgment for this amount from PCA.

PCA filed an answer to the intervening complaint and denied the material allegations of the intervening complaint and denied that it was indebted to the Thorntons. PCA then filed a counter-complaint against the Thorntons seeking a deficiency judgment. The counter-complaint states in part:

\* \* \* \* \* \*

6. PCA would state that all collateral pledged by the Thorntons with the exception of the collateral in dispute in the case at bar has been sold and that all proper credit has been given toward the indebtedness and that there remains outstanding an amount of Two Hundred Forty-Eight Thousand Seven Hundred Forty-Nine & 85/100 Dollars ($248,-749.85) plus accruing interest and attorney's fees as provided for in said Note, said amount remaining unpaid.

\* \* \* \* \* \*

The Thorntons answered PCA's counter-complaint by joining issue on the material allegations and denying indebtedness to PCA. On November 26, 1985, the Thorntons filed a motion to amend the answer to the counter-complaint in order to allege that PCA conducted the sale of the collateral in a commercially unreasonable manner and in violation of T.C.A. § 47–9–504. The court allowed the amendment by order of December 3, 1985, and the case proceeded to trial on that date. At the conclusion of the nonjury trial, the trial court entered the following order:

This cause came on to be heard on the 3rd day of December, 1985, before the Honorable Marion H. Holmes, Jr., Chancellor upon the complaint filed by Farm-

ers and Merchants Bank (hereinafter Bank); the Answer to Complaint and Counter-Claim filed by Dyersburg Production Credit Association (hereinafter PCA); the Intervening Petition filed by Linus A. Thornton, Donna Thornton, Robert Reed Thornton and Juanita V. Thornton, (hereinafter Thornton); the answer to Intervening Petition and Counter-Claim filed by PCA; the Answer to Counter-Claim of PCA filed by Bank; and the Answer to Counter-Claim, as amended, to Intervening Petition of PCA filed by Thornton, witnesses examined in open Court and the entire record in the cause, wherein the Court finds:

1. Bank's claim to a superior lien position to that of PCA in certain cotton pickers (Thornton's one-half interest), cattle, gooseneck trailer and ditch bank mower should be dismissed as the Court is of the opinion that PCA holds superior properly perfected security interest in same.

2. Thornton's claim to compensation for feeding the cattle should be dismissed as Thornton is not entitled to same.

3. PCA's sale of collateral pledged by Thornton as security for PCA's debt was commercially reasonable (pursuant to Tennessee Code Annotated Section (47–9–504)) in all respects based on the facts and circumstances then and their surrounding the sale.

4. PCA is entitled to a judgment against Bank for $1100.00 for lost interest due to Bank's halting of the foreclosure sale as to the disputed collateral as well as $500.00 for costs and expenses involved in readvertising and reselling of said collateral.

5. PCA is entitled to a judgment against Thornton in the amount of $254,-285.47 as the deficiency on the PCA note.

6. PCA shall credit the net proceeds from the sale of the disputed collateral to the judgment set forth in paragraph number 5 above.

7. Court costs are taxed ⅓ to each party.

All of the findings set forth above are so ORDERED, ADJUDGED AND DECREED this the 11 day of Jan., 1986.

The Bank's issues presented for review are:

1. Whether the trial court erred by finding that PCA held a superior security interest in the property to which Bank asserts a claim.

2. Whether the trial court erred in awarding a judgment against Bank for damages.

Thornton's issues presented for review are:

1. Whether the trial court erred in finding that PCA's sale of the personal property collateral was conducted in a commercially reasonable manner and in awarding a deficiency judgment against the Thorntons.

2. Whether the trial court erred in not awarding compensation to Linus Thornton for his care and maintenance of the livestock.

PCA's issue presented for review is:

1. Whether the trial court erred in allowing Thorntons to amend the answer to the counter-complaint in order to rely upon the failure of PCA to conduct a commercially reasonable sale as a defense to the counter-complaint.

We will now consider the issues presented.

### BANK'S ISSUES

1. Whether the trial court erred by finding that PCA held a superior security interest in the property to which Bank asserts a claim.

The record reflects that a financing statement (UCC–1) executed by the Thorntons securing PCA was filed January 18, 1978, in the Register's Office of Gibson County covering all crops, all farm machinery and equipment, and all cattle located on the designated farm. The UCC–1 includes all after-acquired property. The continuation statement for this UCC–1 was filed in said register's office on February 11, 1983. On February 1, 1982, the Thorntons obtained a loan from PCA in the amount of

$1,000,000 and executed a promissory note evidencing the loan payable on demand. The note was secured by a security agreement and on March 18, 1982, PCA filed a UCC–1 executed by the Thorntons covering all crops, all farm machinery and equipment, and all cattle located on the designated farm. This financing statement also included an after-acquired property clause. PCA's security interest remained duly perfected at all times material to the issues before the court.

Bank contends that it had the prior security interest in certain cattle, a gooseneck trailer, a ditch bank mower, and two John Deere cotton pickers. The Bank's claim is based on its financial transactions with the Thorntons as follows:

On December 31, 1977, Bank loaned the Thorntons and Olice C. Fields $12,000, evidenced by a promissory note due December 31, 1978, secured by a security agreement covering two John Deere cottonpickers. The money was advanced for 1977 crop expenses and the UCC–1 was filed January 3, 1978, and a continuation statement was filed March 19, 1985. All parties concede that only the Thorntons' undivided one-half interest in the cotton pickers is involved in this litigation.

On May 29, 1979, Bank loaned the Thorntons $2,923.30 to purchase a ditch bank mower and the loan was evidenced by a promissory note payable May 29, 1980, and secured by a security agreement covering the ditch bank mower. A UCC–1 was filed May 30, 1979. No continuation statement has been filed.

On January 15, 1980, Bank loaned the Thorntons $7,000 evidenced by a promissory note payable January 15, 1981, which was secured by a security agreement covering a 1978 GMC truck and a gooseneck trailer (the gooseneck trailer is the only item claimed by Bank), and a UCC–1 was filed January 25, 1984.

On September 23, 1980, Bank loaned Thorntons $14,500, evidenced by a promissory note due September 23, 1981, and secured by security agreement covering 29 mixed calves, 17 mixed cows, and one bull. The loan was made for the purchase of cattle, and the UCC–1 was filed September 27, 1980. No continuation statement has been filed.

■ Bank contends that it should be granted priority for the ditch bank mower, gooseneck trailer, and cattle, because they held a purchase money security interest. We agree that Bank held a purchase money security interest in these items, *see* T.C.A. § 47–9–107 (1979). However, all of the items in dispute in this case constitute farm equipment, and filing is required to perfect the security interest therein. *See* 47–9–302(3)(c) (1979).

■ The record reflects that as to the gooseneck trailer, the financing statement was not filed until January 25, 1984, long after PCA perfected its security interest which includes this trailer. Bank's security interest in the mower and cattle were properly perfected initially, but no continuation statements were filed. T.C.A. § 47–9–403(2), as in effect at the time material herein states:

(2) A filed financing statement which states a maturity date of the obligation secured for twenty (20) years or less is effective until such maturity date and thereafter for a period of sixty (60) days. Any other filed financing statement is effective for a period of five (5) years and sixty (60) days from the date of filing. The effectiveness of a filed financing statement lapses on the expiration of such sixty-day period after a stated maturity date or on the expiration of such five-year and sixty-day period, as the case may be, unless a continuation statement is filed prior to the lapse. Upon such lapse the security interest becomes unperfected. A filed financing statement which states that the obligations secured are payable on demand is effective for five (5) years and sixty (60) days from the date of filing.

By virtue of this statute, the filed financing statements lapsed sixty days after the respective maturity dates, while at the same time PCA's security interest was perfected. By virtue of the lapse, the security interest of Bank became unperfected, and the per-

fected security interest of PCA took priority. Bank makes some contention that the bankruptcy proceeding filed in February, 1984, in some way affected Bank's obligation to keep its security interest perfected. We find nothing of merit in this argument. Bank does not seriously contend that it should prevail on the two cotton pickers in which the Thorntons had an undivided one-half interest. As to these cotton pickers and the other items, we concur in the trial court's finding that PCA has a prior security interest.

2. Whether the trial court erred in awarding a judgment against Bank for damages.

As noted, the trial court entered a judgment against Bank for $1,100 "for lost interest due to Bank's halting of the foreclosure sale as to the disputed collateral as well as $500 for cost and expenses involved in re-advertising and reselling of said collateral."

Although the Bank's brief is deficient in its argument on this point, our examination of the record indicates a failure of proof by PCA to support the award. We quote from the testimony of PCA's witness on this issue:

Q. What do you estimate that the interest that's been lost by the PCA as the result of not being able to have this sale and sell this collateral between January the 18th and now has been?
A. On the items that were prevented from selling?
Q. Yes.
A. I believe approximately—interest cost would have been about $1100.00.
Q. All right. Has the PCA had to expend attorney's fees to defend the action of the Farmers & Merchants Bank?
A. Yes.
Q. What do you estimate the amount of those fees have been?
A. I don't know for sure. I'd say in the neighborhood of, say, $7,000.00.
Q. What do you estimate that the—
THE COURT: Let me find out what your're talking about.
A. The attorney's fees.

THE COURT: Are you talking about additional fees from the time of the sale until now?
A. Yes, sir.
Q. My question was, what fees have been expended in the defense of the action that was brought by the Farmers & Merchants Bank to restrain the selling of the collateral. Now what do you estimate will be the cost to readvertise and resell the items of collateral that you were stopped from selling?
A. Well, it will cost more attorney's fees.
Q. All right. Do you have any estimate as to what that might be?
A. $500.00. I don't know.
Q. All right. What about the depreciation or loss in value of the collateral between January and now?
A. Well, on that equipment some of it— You know, it's been stated earlier some of it was about depreciated out. It might be some use cost involved.
Q. What do you estimate that would be?
A. I don't know. It'd just be a guess. I'd say $500.00.
THE COURT: Now what did you say that was?
A. Be on the two cotton pickers and a stock trailer, just be use cost.
Q. What do you mean by use cost?
A. Well, if it's depreciated out naturally there's a difference in depreciation and use cost. It's just a value we place on something. It goes down in value just from use, cost, wear and tear.

It is clear from the testimony quoted that any award made by the court to PCA was based on speculation and encompassed things that were not proper items for damages. In connection with the alleged lost interest, we note that interest was accruing on the indebtedness owed by the Thorntons to PCA. The sale of the items sold was credited to the indebtedness and thus reduced the amount of interest running. PCA still had its claim for interest on the balance of the indebtedness owed by the Thorntons, and the prevention

of the sale as to some items did not stop this interest from accruing. Furthermore, the testimony amounts to nothing more than the grossest kind of speculation for the alleged items of damages. We also note that, insofar as the award is based on some amount of attorney's fees, there is no statute nor contract between the parties authorizing attorney's fees to be awarded. *See State ex rel. Orr v. Thomas*, 585 S.W.2d 606 (Tenn.1979).

Accordingly, the judgment of the trial court against Bank awarding damages is reversed.

## THORNTON'S ISSUES

1. Whether the trial court erred in finding that PCA's sale of the personal property collateral was conducted in a commercially reasonable manner and in awarding a deficiency judgment against the Thorntons.

T.C.A. § 47–9–504 (1979) provides in part:

47–9–504. *Secured party's right to dispose of collateral after default*—(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.

\*　　\*　　\*　　\*　　\*　　\*

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

T.C.A. § 47–9–507 (1979) provides in part:

§ 47–9–507. *Secured party's liability for failure to comply with this Part.* (1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part.

(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

The burden of proving that a sale of collateral is commercially reasonable under these statutes is on the secured party seeking the deficiency judgment. *Cullum and Maxey Camping Center, Inc. v. Adams*, 640 S.W.2d 22 (Tenn.App.1982); *Investors Acceptance Co. of Livingston, Inc. v. James Talcott, Inc.*, 61 Tenn.App. 307, 454 S.W.2d 130 (1969).

The record establishes the following facts concerning the January 18, 1985, sale. PCA's notice of sale dated January 7, 1985, was mailed to the Thorntons and was posted at the Gibson County Courthouse, Gibson Tractor Company, and the PCA office, and established the date, time, and place of the sale as January 18, 1985, at 1 p.m. at the PCA office. The hogs to be sold were not available at the place of sale for inspection, and the farm equipment to be sold was likewise not available for inspection and viewing at the place of the sale. The vice president of the bank testified that the sale lasted about 15 minutes and that four or five major items were sold during the first minutes of the sale and were all purchased by PCA. The remaining 60 to 65 items were sold together. This vice-president testified without objection that a per-

son at the sale stated that he had called PCA in order to attempt to see the hogs prior to the sale, but was told that he would not be allowed to see them. Linus Thornton testified that only one or two pieces of equipment sold at a reasonable price and that the other pieces brought less than they were worth. He further stated that the hogs should have been available for inspection because they are graded according to various qualifications and that he had never known of anyone who purchased hogs sight unseen. He testified that the value of the hogs was approximately $39,000 on the date of the sale, although they sold for only $25,000. Mr. Thornton observed that the farm equipment had been used and had not been refurbished after its last use and that the equipment obviously would not bring the best price without being cleaned up and the necessary repairs made. He stated that the combine sold at the sale for $29,000 was worth $38,000 and that the pieces of equipment sold together were worth between $100,000 and $105,000 although the sale brought only $67,200. He further testified that the John Deere combine sold for $8,000 to $9,000 less than its fair market value and that the tub grinder sold for approximately $2,500 less than its value. He testified that his neighbors were not aware of the sale and that only four people attended the sale other than the Thorntons, the bank representatives, and the PCA representatives.

Thornton's testimony concerning the hogs was corroborated by an employee of Trenton Livestock Sale Barn who had over forty (40) years of experience in dealing in hogs. A hog farmer also corroborated Thornton's testimony and further testified that he was discouraged by PCA's representatives from trying to see the hogs in order to ascertain their value prior to the sale. Proof was introduced from a hog salesman that he had inventoried the pigs on the day after the sale and estimated the value at $39,064, although they brought only $25,000 on the day of the sale. The Thorntons introduced other proof from auctioneers, real estate brokers, and farmers which established that the better method

for conducting the sale of farm equipment would be to clean and repair the equipment and have it available for inspection for some period of time prior to the sale date. The testimony indicated that the equipment should be sold at its location and that it preferably should be sold item by item.

PCA introduced proof from a local farm equipment dealer who attended the sale and stated that the sale was public knowledge in the community and that a number of farmers were present for the sale. The dealer further stated that he was familiar with the Thornton's operation and that in his opinion the equipment brought more than he, as a dealer, was prepared to pay for it. PCA representatives testified that PCA appraised all of the equipment and determined the value of it for bidding purposes based on their knowledge and experience as well as various publications regarding market prices of equipment. The PCA representative testified that based on these factors the equipment brought more than the established market price. The testimony from PCA indicated that there were at least 15 bidders present at the sale other than the interested parties. The value of the hogs was determined by using monthly inventories provided by the Thorntons and the information the Thorntons presented at the bankruptcy proceedings. In the bankruptcy proceedings, the Thorntons valued the hogs at $30,000 and the equipment at $143,200. PCA's representative denied that PCA refused anyone the right to view and inspect the equipment and hogs. To the contrary, the representative testified that upon inquiry persons wishing to inspect the property were told that it was located at the Thornton farm and they were to go through Linus Thornton in order to see it.

■ Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d). In order to determine whether a sale is commercially reasonable under the

code, the trial court and this Court must consider the combined effect of the many factors involved in the sale. The advertisements or notices of sale were posted at three places, a farm equipment dealership, the courthouse, and the place of sale. There was testimony in the record that it was common knowledge in the community that the sale would take place as advertised. While the equipment and livestock were not located at the place of the sale, the PCA office, there is testimony in the record that both the equipment and livestock were available for inspection at the Thornton farm prior to the sale. The sale itself brought a sum reasonably close to the value placed on the property by the Thorntons in the bankruptcy proceeding. The Thorntons contend that PCA should have cleaned up and repaired the equipment prior to the sale. We agree that such a course might be preferable if you were having a voluntary liquidation of an estate. However, we must bear in mind that the expense of repairing and cleaning up the equipment must ultimately be placed on the debtor, and the record in this case simply does not reflect that PCA's judgment in this regard was deficient. Furthermore, there was proof in the record that the equipment and livestock brought more at the sale than its valuation prior to the sale. Therefore, considering all of the factors involved and taking the testimony as a whole, we cannot say that the evidence preponderates against the trial court's findings that the sale was conducted in a commercially reasonable manner.

2. Whether the trial court erred in not awarding compensation to Linus Thornton for his care and maintenance of the livestock.

■ Prior to the sale on January 18, 1985, PCA was given permission by the bankruptcy court to proceed with the sale, and when this was done PCA and Linus Thornton made an agreement concerning the care and maintenance of the livestock. Pursuant to the agreement, Thornton was paid for the care of the livestock through the date of the foreclosure sale, January 18, 1985. Thornton contends that he is entitled to be paid for taking care of the cows which were not sold by virtue of the restraining order for the period of time subsequent to January 18, 1985. PCA takes the position that the bank stopped the sale, that this was not within the agreement between PCA and Thornton, and that, until the sale was held, the property belonged to the Thorntons. There was clearly a conflict in the evidence concerning the agreement from the witnesses for each party. Where issues in a case turn upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide that issue. Therefore, such findings that are related to the issue of credibility will not be disturbed by this court, absent other concrete evidence to the contrary which shows that the trial judge erred in his judgment of the veracity of the witnesses. *State ex rel. Balsinger v. Town of Madisonville*, 222 Tenn. 272, 435 S.W.2d 803 (1968); *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488 (Tenn.1974).

Accordingly, we find Thornton's assertions on this issue without merit.

PCA'S ISSUE

Whether the trial court erred in allowing Thorntons to amend the answer to the counter-complaint in order to rely upon the failure of PCA to conduct a commercially reasonable sale as a defense to the counter-complaint.

■ On November 26, 1985, just prior to the December 3, 1985, trial date, the Thorntons filed a motion to amend the answer to the counter-claim to include the defense that PCA's sale was not conducted in a commercially reasonable manner. The court entered an order allowing the amendment on December 3, 1985, the morning of trial. A review of the record does not indicate that PCA contended that it was taken by surprise and was unprepared to respond to such a pleading, nor is there any

indication that PCA sought a continuance in order to prepare to meet such a plea.

Tenn.R.Civ.P. 15.01 provides in part:

15.01 *Amendments.*—A party may amend his pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been set for trial, he may so amend it at any time within fifteen (15) days after it is served. Otherwise a party may amend his pleadings only by written consent of the adverse party or by leave of court; and *leave shall be freely given when justice so requires.* (Emphasis supplied.)

In *Branch v. Warren,* 527 S.W.2d 89, 91–92 (Tenn.1975), Justice Henry of the Supreme Court discussed the effect of Tenn.R.Civ.P. 15.01:

The new Rules of Civil Procedure, in this regard "come not to destroy the old law, but to fulfill." They were designed to simplify and ease the burden of procedure under the sometimes harsh and technical rules of common law pleading. Accordingly, Rule 15.01 provides that leave (to amend) shall be freely given when justice so requires. This proviso in the rules substantially lessens the exercise of pre-trial discretion on the part of a trial judge. Indeed, the statute (§ 20-1505, T.C.A.) which conferred a measure of discretion on trial judges was repealed and Rule 15 stands in its place and stead. That rule needs no construction; it means precisely what it says, that "leave shall be freely given."

In *Craven v. Lawson,* 534 S.W.2d 653, 655 (1976), Chief Justice Fones stated; "Rule 15 tells trial judges that leave to amend shall be freely given when justice so requires."

Amendments to pleadings lie within the sound discretion of the trial court, but the rule mandates the allowance of amendments if justice requires. In the case at bar, PCA did not deem it necessary to seek a continuance and apparently felt that it was prepared to meet the defense presented. Under these circumstances, we do not feel that the trial court abused its discre-

tion in granting the amendment. We find PCA's contention on this issue without merit.

In summary the judgment of the trial court for PCA against the bank is reversed, and the judgment is in all other respects affirmed. The case is remanded for such further proceedings as necessary and costs on appeal are assessed one-third against the bank, one-third against PCA, and one-third against the Thorntons.

FARMER and NEARN (Retired), JJ., concur.