IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 19, 2021 Session

## AARON J. CRYER, ET AL. v. CITY OF DYERSBURG, ET AL.

**Appeal from the Circuit Court for Dyer County**
**No. 16-CV-38      R. Lee Moore, Jr., Judge**
_____

### No. W2020-00045-COA-R3-CV
_____

City employees brought action against the city upon its amendment of the pension plan. The trial court ruled in favor of the city. The employees appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which Arnold B. Goldin and Kenny W. Armstrong, JJ., joined.

Deborah Godwin, John F. Canale, Memphis, Tennessee, and Megan K. Mechak, Washington, D.C. for the appellants, Jason M. Alexander, and Aaron J. Cryer.

Scott K. Haight, Christine A. Coronado, and Becky Dykes Bartell, Dyersburg, Tennessee, for the appellees, City of Dyersburg, Tennessee, John Holden, Bob Jones, and Steve Anderson.

## OPINION

## I. BACKGROUND

The City of Dyersburg ("City"), a municipal corporation in the State of Tennessee, is governed by an elected mayor and an eight-member Board of Aldermen (collectively, the "Board"). At the time of the action, John Holden was the mayor and had served in that position since 2007.

In 1979, the City established a "defined benefit pension plan." It was amended effective July 1, 2001 ("2001 Pension Plan") and then again on December 7, 2015 ("2015

Pension Plan"). Employees contributed 5% of their salary to the plan. Pursuant to the 2001 Pension Plan, employees who provided 30 years of service to the City received a benefit equal to 2% multiplied by their years of service multiplied by the monthly average of their highest 36 months of salary, regardless of age. Retirees also received an annual Cost-of-Living Adjustment ("COLA") of 2% or the amount of the Consumer Price Index, whichever is less. Prior to the 2015 amendment, there were 283 participants in the plan. As of July 1, 2013, the present value of the benefits in the plan was $23,580,225; the unfunded accrued actuarial liability was $14,215,667. In 2006, the City's prior administration did not make an annual contribution to the plan. When Mayor Holden came into office in 2007, he made the contribution due for 2007, as well as the 2006 contribution. From 2008 to 2010, however, the City lost over 1,000 jobs. No salary increases occurred during the five years following 2008. A significantly unfunded pension liability arose.

In approximately 2012, the plan was evaluated for potential cost-saving revisions. Mayor Holden formed a retirement committee, joining with himself as members Bob Jones, City Recorder; Sue Teague, Human Resources Director; and Steve Anderson, City Treasurer. Around February 2014, the City became aware of potential changes in Tennessee law that would, at a minimum, mandate municipalities to make 100% of the annual required contribution toward pension plans within five years. Mayor Holden and other City officials met with the State Treasurer and State Senate Majority Leader to seek guidance regarding what would become the "Public Employee Defined Benefit Financial Security Act ("Act") of 2014."[1]

## **The Act**

The Act established a required set of procedures to help state political subdivisions, like the City, which had existing but underfunded pension funds, achieve sustainability. It required any political subdivision with a defined benefit plan not administered by the Tennessee Consolidated Retirement System ("TCRS") to develop a funding policy for financing the obligations under its pension plan. Tenn. Code Ann. § 9-3-504(b). The funding policy must be "legally adopted and approved through a resolution by the political subdivision's chief legislative body or governing body." Tenn. Code Ann. § 9-3-504(b). It also must, in pertinent part, include a statement that the political subdivision's budget will include funding of at least 100% of its actuarially determined contribution ("ADC"). Tenn. Code Ann. § 9-3-504(c)(3).[2] If a political subdivision is not paying at least 100% of its ADC, the Act requires a "Plan of Correction," in which the entity must explain how it will do so, subject to a five-year phase-in period. Tenn. Code Ann. § 9-3-505(b). The Plan of Correction must be submitted to the State Treasurer and approved by the State Funding

---

[1]Public Chapter 990, codified at Tennessee Code Annotated §§ 9-3-501 – 9-3-507. Signed into law on May 22, 2014.

[2]The ADC means "the actuarially determined annual required contribution that incorporates both the normal cost of benefits and the amortization of the pension plan's unfunded accrued liability." Tenn. Code Ann. § 9-3-503(a)(1).

Board. If a political subdivision fails to fund its ADC at 100%, the Commission of Finance and Administration is authorized to withhold such amount or part of such amount from any state-shared taxes that are otherwise apportioned to the political subdivision, and such money shall be paid to the political subdivision's pension plan. Tenn. Code Ann. § 9-3-507(a). Significantly, the deduction is made as a first charge against any moneys payable to the political subdivision, regardless of the source of such payments and the purpose or contemplated use of such funds. Tenn. Code Ann. § 9-3-507.

At the time the Act was enacted, the City was using the 2001 Pension Plan, under which it was not required to make any contribution to its plan. However, the City was contributing 6.5% of its payroll amount to its plan, generating a yearly contribution of approximately $800,000. The City has always paid every benefit due pursuant to the plan, but the parties agree that the plan was substantially underfunded before the 2015 Pension Plan amendment. As of 2014-2015, the City's plan had an unfunded accrued liability of about $22.4 million.

Faced with the new law and a funding crisis, the City's Retirement Committee issued a request for proposals for a new actuary. The request was comprised of two parts: (1) an "analysis of the plan to assess the annual funding requirements that will be required with this new legislation and analysis of the means by which such funding requirements can be achieved," and (2) "provision of ongoing actuarial services." Alan Pennington was selected to serve as the City's new actuary.

The City desired to continue its plan and to provide meaningful benefits that were properly funded and sustainable. It did not want to freeze the plan, which would have prevented participants from earning any additional benefits. Further, notwithstanding that the 2001 Pension Plan allows for its termination, the City did not want to end it.

According to the City Defendants, as part of the review process, Mr. Pennington conducted an "Experience Study" of the plan (reviewed the last five years of the plan to see if the experience was consistent with the assumptions being made in the valuation to determine the City's ADC). Mr. Pennington also completed a "Valuation Report," which he used to determine the ADC for the plan's funding purposes in order to ensure that the future investment return plus contributions will be sufficient to pay the future expected benefits. Under the Act's more conservative actuarial assumptions, Mr. Pennington concluded that the City's ADC increased to $2.15 million, almost triple the budgeted amount of approximately $800,000, which constituted a substantial increase from the historic 6.5% of payroll to 26.8% of payroll. According to Mr. Pennington, unless the City made changes to its plan, it likely would become insolvent by July 2019. Mr. Pennington testified that even if the City doubled its existing contribution level to 13% of payroll, the plan would become insolvent by 2021.

Accordingly, the 2001 Pension Plan was reviewed to determine what changes the

City could make to it. Mr. Pennington testified that he looked at what were the most actuarially unsound provisions of the plan and tried to find a way to modify it to achieve an ADC the City could maintain without reducing the vested or accrued benefits. According to Mr. Pennington, he considered modifications to the ancillary benefits, many of which were the least used benefits by the plan participants. He was not asked by the City to make certain specific changes to the plan; instead, the City relied upon his advice to ascertain the required adjustments:

> [He] put forward a number of potential changes. Sat down with retirement committee, discussed those changes. Got their feedback. Made some modifications to some of those changes based on their feedback. And then, came up with an ultimate set of recommendations after a back and forth process to determine . . . what would make the objectives that they had put forward and that they were comfortable with.

The City considered Mr. Pennington's suggestions and further discussed other possible changes. One option the City reviewed was increasing employee contributions. However, in order to meet the necessary contribution for 2014, the City would have been required to increase plan participant contributions from 5% to 32% of payroll, which was not financially feasible. The City also reviewed whether there were additional funding sources other than property taxes, which the City had already increased five times in a thirteen-year period, beginning in 2007. None were readily found.

After due consideration, the City, through the actions of the Retirement Committee, concluded that it was reasonable and necessary to revise the 2001 Pension Plan to reduce the total liability of the plan. The City determined that it had to reduce the ADC to an amount that could be reasonably reached within the five-year period mandated by the Act while, at the same time, avoiding major cuts to essential City services or impossible tax increases.[3] The changes proposed by Mr. Pennington and the Retirement Committee were as follows:

> 1. To close the plan to non-vested plan participants and new entrants; Non-vested plan participants will no longer be eligible to participate in the plan.

> 2. To sponsor a new TCRS 401(k) plan to non-vested participants, non-participants and new hires. In the TCRS 401(k) plan, the employer matches employee contributions up to 3% of pay. The matching portion will be 100% vested after five years – 20% per year for five years. Employee contributions are always 100% vested.

---

[3]All the members of the Retirement Committee were participants in the plan when they considered the changes to it. Thus, any changes the Committee elected to make to the plan affected them individually.

- 4 -

3. To no longer allow a participant who voluntarily leaves the plan to restart contributions in the future. (However, non-contributing participants in the plan will, at any time, be permitted to elect to participate in the new City TCRS 401(k) plan).

4. To eliminate the annual COLA for retirees under age 70 and reduce to 1% for retirees between ages of 70 and 74. Retirees age 75 or older should continue to receive a 2% annual increase.

5. To modify the present value percentage used to calculate lump sum distributions. The new present value percentage for lump sums will reduce lump sum payments by approximately 15% for plan participants receiving unreduced retirement benefits.

6. To pay out lump sum distributions in excess of $100,000 over five years.

7. To phase out the ability to retire early after 30 years of service with unreduced benefits based on plan participants' service as of December 7, 2015. Specifically, if an employee has served at least 25 years the unreduced benefits will still be available after 30 years. If an employee served at least 15 years but less than 25, unreduced benefits are available after 35 years. For employees who have served less than 15 years, unreduced benefits are no longer available.

8. To eliminate the opportunity to purchase prior service.

9. To eliminate hardship withdrawals.

10. To change the vesting schedule for partially vested plan participants so that the vesting percent will not change until the member completes 10 years of service, at which time the vesting percent will go to 100%.

11. To implement a one-time service sell back plan whereby plan participants will be permitted to sell back all or a portion of their accumulated service years for an immediate lump sum payment.

On December 7, 2015, the City's Finance Committee considered the proposed changes to the plan. It adopted the "Pension Funding Policy of the City of Dyersburg" as required by Tennessee Code Annotated section 9-3-504(b), the "Plan of Correction" as required by Tennessee Code Annotated section 9-3-504(c)(3) and Tennessee Code Annotated section 9-3-504(b), the Amended and Restated City of Dyersburg Pension Plan, and a new 401(k) plan to be administered by TCRS. The changes approved by the Finance Committee reduced the City's projected ADC from $2.15 million to $1.7 million.

Following the Finance Committee meeting, the Board met and unanimously approved and adopted the same changes.

The Plan of Correction was subsequently tendered to the State Treasurer, who forwarded it to the Tennessee State Funding Board and recommended approval. The State Treasurer's Recommendation Memo provides:

> Treasury staff has reviewed the plan of correction and has determined that it meets the requirements of applicable law. I recommend that the State Funding Board approve the plan of correction submitted by the City of Dyersburg. The actions by the city to close the [Defined Benefit] plan, start a 401(k) plan, make structural changes to the now closed [Defined Benefit Plan], and establish a service sell back program are steps that support allowing the city greater flexibility to reach 100% funding of the ADC.

The State Funding Board approved the City's Plan of Correction on December 21, 2015. On January 6, 2016, the Comptroller of the Treasury advised Mayor Holden by letter of the approval.

Aaron "Jay" Cryer and Jason M. Alexander ("Plaintiffs") are City employees. Both are 100% vested in the 2001 Pension Plan. They believe that this status means that their benefits are guaranteed and not subject to change. They argue that because they have given at least ten years of service to the City and contributed five percent of their annual salary to the plan, their vested interests cannot change. They filed this action on June 2, 2016, challenging the amendments to the City's plan. The Plaintiffs seek a declaratory judgment that the 2015 amendments were void because they violated the principles set forth by the Tennessee Supreme Court in *Blackwell v. Quarterly County Court of Shelby County*, 622 S.W. 2d 535 (1981), and its progeny. They request injunctive relief preventing the City from implementing the 2015 amendments, asserting that they relied upon the promises found in the City's plan and that the 2015 amendments interfere with those promises and their vested pension rights.

In a memorandum opinion and order filed on November 1, 2017, the trial court held as follows:

> The court is convinced that necessary changes in public employee pension plans may be made by the governing body. It appears from the case of *Blackwell v. The Quarterly Court of Shelby County, Tennessee*, 622 S.W.2d 535 (1981) that the rights of employees are subject to the terms and conditions of the pension plan rather than a contractual right. The employees under the *Blackwell* case seem to have no contractual rights other than those conferred by the plan. *Blackwell* also indicates that public opinion demands that there be a right of the public employer to make reasonable modifications

in an existing plan if necessary to create or safeguard actuarial stability, provided that no then accrued or vested rights of members or beneficiaries are thereby impaired. Our Supreme Court in *Blackwell*, stated, "we are not convinced that a plan is frozen against detrimental changes or modifications the moment an employee begins to participate in it, where such changes are necessary to preserve the fiscal and actuarial integrity of the plan as a whole." It is also clear that our Supreme Court adopted the so-called Pennsylvania Rule which permits reasonable modifications when necessary to protect or enhance its actuarial soundness of the plan provided that no such modification can adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement allowance. *Blackwell* also states that modifications cannot be applied detrimentally under the Pennsylvania Rule to any employee[s] who at the time of the amendment were eligible to receive an allowance from the plan.

The court refrained from granting judgment on the issue of whether "the amended plan detrimentally affected vested and accrued rights." The court also concluded:

There is no evidence before the Court as to the reason for the amendment or whether or not the changes made in December of 2015 were necessary to preserve the fiscal and actuarial integrity of the plan as a whole. It is the position of the defendants that this situation is not applicable to the plaintiffs because they do not meet the definitions of having accrued and vested benefits. The Court finds that there could be a question of fact in this area, and the motion of the defendants for summary judgment of the entire case is, therefore, denied.

A bench trial was held on July 29 and 30, 2019, and the final memorandum and order was issued on December 12, 2019. The trial court determined that the modifications made by the City in 2015 were permitted by the 2001 Pension Plan and state law, and that the modifications were not arbitrarily done, but done with consideration from the City to keep a pension plan for its employees that was actuarially and fiscally sound. The court specifically concluded:

The Court finds that the 2001 Pension Plan provided for amendments to be made. The Court also finds that under the case of *Blackwell v. Quarterly Court of Shelby County*, 622 S.W.2d 53, that public policy demands that necessary changes in public employee pension plans may be made by the governing body to the extent and under the conditions discussed in the *Blackwell* case. Public policy demands that there be a right on the part of the public employer to make reasonable modifications in an existing plan if necessary to create or safeguard actuarial stability, provided that no then accrued or vested rights of members or beneficiaries are thereby impaired.

The Court finds that the City modified the plan. The modification was not arbitrarily done or done without consideration from the City to keep a pension plan for the city employees that was fair and reasonable. The issue, however, for this Court to determine is whether or not in modifying the 2001 Pension Plan there were accrued and vested rights of the plaintiffs impaired by the modifications. *Blackwell* finds "vested interest" [means] that the employee had interest in the assets of the retirement system, so as to render the same immutable and beyond necessary amendment by the governing body. *Blackwell* permits reasonable modification when necessary to protect or enhance the actuarial soundness of the plan provided that no such modifications can adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement allowance.

It is the position of the plaintiffs that modifications did, in fact, impair their rights under the 2001 Pension Plan. It is the position of the City that the modifications were allowable and that the modifications did not affect rights that were both vested and accrued. The City argues that vested and accrued benefits are defined specifically in the 2001 City of Dyersburg Pension Plan. The defendants argue that Section 1.1 finds accrued benefit as meaning the benefit amount earned by a participant as of a specified date as determined by Section 4.1. Section 4.1 provides that each participant will be entitled to retire at normal retirement date and to receive accrued benefit payable as a formal form of retirement benefit equal to the amount determined in accordance with the provisions of that section. The City argues that the benefits are not vested and accrued until the retirement age. Section 1.32 finds normal retirement age being age 60 for participants hired prior to February 1, 1989, and age 65 for participants hired on or after February 1, 1989. Although both plaintiffs certainly felt that they had vested benefits prior to the amendment, under the terms and conditions of the 2001 Pension Plan, benefits are not both fully accrued and vested until normal retirement age. Both plaintiffs were employed by the City of Dyersburg after 1989. The normal retirement age for both plaintiffs would be age 65. Section 4.1 of the 2001 Pension Plan provides that each participant will be entitled to retire at normal retirement age and receive an accrued benefit payable as a normal form of retirement benefit equal to the amount determined in accordance with the provisions of this section. It appears to the Court, that the benefits became accrued and vested as of age 65.

Section 4.7 of the 2001 Pension Plan provides that a participant shall have a 100% vested interest in his or her accrued benefit upon reaching normal (if applicable early) retirement age prior to termination of employment, death or disability.

It appears also to the Court that the cost of living adjustment; the phase out 30-and-out provision; the disability benefit provisions; the rate of interest and the rate of employee contribution are all ancillary benefits subject to modification. The actuaries for both plaintiffs and defendant seem to indicate that some of these type benefits are ancillary benefits. The actuary hired by the City to help prepare the 2015 amendment testified specifically that they were all ancillary benefits. His testimony was more persuasive than the testimony of the plaintiffs' actuary. The Court also finds that the City Pension Plan was not prohibited by ERISA[4] from making the amendments. The Court, therefore, finds that the modifications made by the City in 2015 were permitted under the 2001 Pension Plan and that they did not affect the plaintiffs' accrued and vested benefits. The Court finds that the modifications were reasonable and necessary to preserve the actuarial integrity of the pension plan and to comply with State law. The complaint is, therefore, dismissed. Costs are assessed against the plaintiffs.

## II. ISSUES

We restate the following issues raised by the Plaintiffs in their appeal as follows:

1. Whether the trial court erred by applying the wrong legal standard and concluding that the City could amend the pension plan because doing so did not affect the Plaintiffs' "vested and accrued" benefits.

2. Whether the trial court erred by concluding that the 2015 amendments to the City's plan did not violate the principles found in *Blackwell.*

3. Whether the trial court erred by concluding that the COLA, early retirement, disability retirement, and rate of interest earned on employee contributions in the City's plan were ancillary benefits, as that term is defined by ERISA, and could be altered even if it harmed plan participants like the Plaintiffs.

## III. STANDARD OF REVIEW

The standard of review in this action for declaratory judgment and injunctive relief is limited to determining whether the City acted illegally, arbitrarily, or capriciously in enacting the 2015 Pension Plan. *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990). In reviewing legislative acts of local governments, we must review the local government's actions deferentially and should refrain from substituting our judgment for

---

[4]Employee Retirement Income Security Act of 1974 ("ERISA").

the broad discretionary authority of the local governmental body. *Id.* at 641-42.

## IV. DISCUSSION

The City has consistently explained that it revised the 2001 Pension Plan in 2015 for three reasons: (1) to comply with the Act, Tennessee Code Annotated section 9-3-501, *et. seq.*; (2) to help preserve the actuarial and fiscal integrity of the plan; and (3) to create a sustainable plan and to avoid its complete termination. The City asserts that because the Plaintiffs were not eligible for retirement, their rights in the plan were not vested and accrued.

The Plaintiffs argue that the City Defendants did not discuss or consult with the employees that there were plans to amend the pension plan before the amendments were enacted. They contend that if they had been consulted, they would have urged consideration of other alternatives to reducing the plan benefits, such as increasing employee contributions.

According to the Plaintiffs, the early retirement benefit which was eliminated was an important inducement for continued employment. Mr. Alexander claims that he had planned to retire at the age of 57, relying on the 30-year service requirement. He asserts that he will now be required to work five additional years to receive unreduced retirement benefits. He contends that the present value of his retirement benefit was reduced by approximately $141,000 (from $411,000 to $270,000). Mr. Cryer argues that he will have to work until he is 65 and provide approximately 40 years of service before he is eligible to retire with an unreduced pension. According to Cryer, if he were to work 40 years, his retirement benefit will only be based on 35 years of service—he will have to render five years of service without accruing any additional benefit. He claims his retirement benefit was reduced by approximately $97,000 (from $197,000 to $100,00).

The Plaintiffs additionally argue that the elimination of the COLA will negatively impact those employees who retire at a younger age because those retirees will not experience its compounding effect. They further contend that they relied upon the promise of a COLA because an annual increase would ensure that their pension grew as the COLA did, without the need to supplement their retirement benefits. The Plaintiffs also argue that the lump sum payments negatively impact the present value calculation.

### A.

In *Blackwell*, the Tennessee Supreme Court adopted the "Pennsylvania rule, which permits reasonable modifications when necessary to protect or enhance actuarial soundness of the plan, provided that no such modification can adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement allowance." *Id.* at 543. The *Blackwell* Court explained, "We are of the opinion that the Pennsylvania rule is

preferable. It is more in accord with the public interest requiring a reasonable amount of flexibility on the part of the public employer. . . ." *Id.* As the Court determined in *Blackwell*:

> [W]e are not convinced that a plan is "frozen" against detrimental changes or modifications the moment an employee begins to participate in it, where such changes are necessary to preserve the fiscal and actuarial integrity of the plan as a whole. It seems to us that public policy demands that there be a right on the part of the public employer to make reasonable modifications in an existing plan if necessary to create or safeguard actuarial stability, provided that no then accrued or vested rights of members or beneficiaries are there by impaired.

*Id.* at 540-41. The *Blackwell* Court found that "the modification cannot be applied detrimentally under the Pennsylvania rule to any employees who . . . were eligible to receive an allowance from the plan" as of a date certain. *Id.* at 543.

Thus, the *Blackwell* holding provides that a public employer must be allowed to make changes to improve the health of a pension plan. In the instant case, had the City not made the necessary changes to the plan, it would have become insolvent and/or been terminated, to the detriment of all the plan participants.

The 2001 Pension Plan provides on its first page: "in accordance with the terms of the Plan, the Sponsor has the ability at any time, and from time to time, to amend the plan[.]" Section 9.1 of the plan allows that the City has the right and authority to amend it at any time, subject to certain conditions:

> The Sponsor, or if there is no Sponsor, the Trustee, will have the right to amend the Plan at any time subject to the following provisions:
>
>> (a) **General Requirements**: Amendments (including a change in the actuarial basis for determining optional or early retirement benefits) must be in writing and cannot
>>
>>> (1) increase the responsibilities of the Trustee or Administrator without written consent; (2) deprive any Participant or Beneficiary of Plan benefits to which he or she is entitled; (3) decrease the amount of any Participant's Accrued Benefit except as permitted under Code § 412(c)(8); (4) permit any part of the Trust Fund to be used for or diverted to purposes other than the exclusive benefit of the Participants or their Beneficiaries except as required to pay taxes and administration expenses, or cause or permit any portion

- 11 -

of the Trust Fund to revert to or become the property of the Employer; or (5) eliminate or reduce a retirement-type subsidy, or an early retirement benefit, or an optional form of benefit with respect to benefits attributable to service before the amendment. In the case of a retirement-type subsidy, this provision will apply only to a Participant who satisfies the pre-amendment conditions for the subsidy either before or after the amendment. In general, a retirement-type subsidy is a subsidy that continues after retirement, but does not include a qualified disability benefit, a medical benefit, a social security supplement, or a death benefit (including life insurance).

The trial court determined that none of the conditions in Section 9.1(a) apply to the 2015 amendments. The Plaintiffs had not met the requirements to be eligible for any of the claimed benefits. Further, the amendments did not decrease the amount of their accrued benefits under the 2001 Pension Plan. A plan is "not set in stone the moment [one's] right to some future benefits vested upon reaching [a certain number of] years of service." *Dodd v. City of Chattanooga, Tenn.*, 846 F.3d 180, 186 (6th Cir. 2017). Therefore, the 2015 amendments were permissible under the 2001 Pension Plan document and *Blackwell*.

**B.**

**<u>Vested and Accrued</u>**

A public employee's rights in a pension plan are a matter of contract. They "are subject to the terms and conditions of the pension plan," and any contractual rights of the employee are "those conferred by the plan." *Blackwell*, 622 S.W.2d at 540. The 2001 Pension Plan contains several provisions relevant to determining what benefits are "vested" or "accrued." Section 1.1 of the plan defines an accrued benefit as follows:

The term Accrued Benefit means the benefit amount earned by a Participant as of a specified date as determined under Section 4.1. A Participant's Accrued Benefit in a given year will never be less than the Actuarial Equivalent of his or her Accrued Benefit as of the end of the prior Plan Year except as otherwise permitted by law or applicable regulation or ruling. . . .

Therefore, a benefit does not become "accrued" until and unless the Participant reaches the relevant "specified date" as determined under Section 4.1. The specified date is defined as "Normal Retirement Age" in Section 1.32, which "means Age 60 for Participants hired prior to February 1, 1989 and Age 65 for Participants hired on or after February 1, 1989." Section 4.1 provides guidance regarding the calculation of benefits at retirement:

[E]ach Participant will be entitled to retire at Normal Retirement Date and to receive an Accrued Benefit payable as a Normal Form of Retirement Benefit equal to the amount determined in accordance with the provisions of this Section.

Each Participant's monthly Accrued Benefit will be an amount equal to 1/12th of the following:

> (a) Benefit Formula: 2% of the Participant's Average Compensation multiplied by his or her completed years and months of Benefit Service as Participant at Normal Retirement Date or earlier Termination of Employment to a maximum of 35 years. . . .

Thus, Sections 1.1 and 4.1 of the 2001 Pension Plan reveal that a benefit does not become "accrued" until a participant reaches the "specified date" of "Normal Retirement Age," which would be 65 for both of the plaintiff participants.

In *Frazier v. City of Chattanooga*, 841 F.3d 433 (6th Cir. 2016), the court defined "accrued" to mean "'[t]o come into existence as a claim that is legally enforceable.'" *Id.* at 437. The benefit did not become legally enforceable until the employee reached the retirement age. In the instant matter, because neither of the plaintiffs had reached the Normal Retirement Age when the 2015 Pension Plan was enacted, they had no "accrued" interest in any of the Claimed Benefits.

Additionally, the Plaintiffs had no "vested" interest in any of the claimed benefits. Section 1.54 of the 2001 Pension Plan states:

> The term Vested Interest means a Participant's non-forfeitable percentage in the Participant's Accrued Benefit which is derived from Employer contributions, and the Participant's non-forfeitable percentage in any account or Accrued Benefit attributable to the Participant's own Plan contributions. A Participant's Vested Interest in the Accrued Benefit derived from Employer contributions will be determined in accordance with Section 4.7.

Section 4.7 provides that "A Participant shall have a 100% Vested Interest in his or her Accrued Benefit upon reaching Normal (or if applicable Early) Retirement Age prior to Termination of Employment, death or disability. . . ."

The Plaintiffs assert that because they had more than ten years of service, they were vested in the plan and that their rights could not be reduced.

- 13 -

Under Tennessee law, "[a]n employee has a 'vested' retirement right when the employee has completed the requisite term of employment necessary to be entitled to receive retirement benefits at some future time." *Cohen v. Cohen*, 937 S.W.2d 823, 826 (Tenn. 1996). *See also Miles v. Tennessee Consol. Ret. Sys.*, 548 S.W.2d 299, 305 (Tenn. 1976) ("[A]n offer of a pension, the acceptance of same, *and the completion of the service of the employee*, creates a vested interest in said pension") (emphasis added). Thus, in order to be vested in the right to receive a benefit, the Plaintiffs "must have completed the requisite amount of years of service to be entitled to receive such benefit." *Dodd v. City of Chattanooga*, 215 F. Supp. 3d 608, 622 (E.D. Tenn. 2016).

It is uncontested that neither of the Plaintiffs had reached the Normal or Early Retirement Age when the 2015 Pension Plan was adopted. Accordingly, despite completing the ten years of service to become vested in plan benefits, they had not yet "completed the requisite term of employment necessary to be entitled to receive" the benefits prior to the 2015 amendments. Thus, the Plaintiffs had not vested in those rights. *See Cohen*, 937 S.W.2d at 826.

## C.

Prior to making the amendments to the 2001 Pension Plan, the City considered whether there were additional sources of funding available to it. Unfortunately, the City determined that the only available options other than amending or terminating the plan[5] were to substantially increase property taxes or to cut essential municipal services. The record reveals that the City gave due consideration to determine the changes that could legally be made to the plan. Based upon the analysis from the actuary, the requirements of the Act, and its own deliberations, the City concluded that it was necessary to revise the 2001 Pension Plan in order to: (i) reduce the total liability of the plan; and (ii) reduce the ADC to a number that could be reasonably reached within the five years mandated by the Act. By adopting all the recommended actions, the City's projected ADC was reduced to approximately $1.7 million in the first year following the adoption of the 2015 amendments. To further reduce its outstanding liability and the ADC, the City also implemented a service sell-back, which allowed participants in the plan to voluntarily sell back service years to the City that would further reduce the total unfunded liability.

The Plaintiffs have failed to present sufficient probative evidence that the 2015 amendments were not "reasonable [and] necessary to create or safeguard actuarial stability." *Blackwell*, 622 S.W.2d at 541. The trial court correctly concluded that the modifications made by the City were "not arbitrarily done or done without consideration from the City to keep a pension plan for the city employees that was fair and reasonable." The court properly found "that the modifications were reasonable and necessary to preserve

_____

[5]The City considered terminating the plan, which was an available option under the terms of the 2001 Pension Plan.

the actuarial integrity of the pension plan and to comply with State law."

## D.

Despite the Plaintiffs' assertions that the City's plan is subject to ERISA's requirements, ERISA does not apply to government plans. 29 U.S.C. § 1003(b)(1). ERISA explicitly exempts "governmental plans" from its coverage:

> (b) The provisions of this subchapter shall not apply to any employee benefit plan if –
>
> (1) such plan is a governmental plan (as defined in section 1002(32) of this title); 29 U.S.C. § 1003(b)(1).

Section 1002(32) defines "governmental plan" as follows:

> The term "governmental plan" means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing. . . .

The clear and unambiguous definition of a governmental plan contained in ERISA establishes that the City's Pension Plan is a "governmental plan" exempt from ERISA.

Further, courts have not permitted a governmental entity to "opt-in" to ERISA. Despite reference to ERISA in a plan's terms, a governmental employer cannot "opt in" to ERISA coverage for its pension plan. *See Krystyniak v. Lake Zurich Cmty. Unit Dist*, No. 95, 783 F. Supp. 354, 356 (N.D. Ill. 1991). 29 U.S.C. § 1002(32) makes no provision for such option; it merely describes which plans are governmental plans and (by implication) which are not. *See Hall v. Maine Mun. Employees Health Trust*, 93 F. Supp. 2d 73, 75 (D. Maine 2000) (stating "[D]esire and compliance do not an ERISA plan make. A benefit plan does not choose whether to opt in or opt out of ERISA."). *See also Michel v. United Healthcare of Louisiana*, No. Civ. A. 03-0649, 2003 WL 1790846 (E.D. La. 2003) (concluding "Congress deliberately excluded governmental plans from the broad sweep of ERISA preemption of state laws" and finding that ERISA did not apply to the plan at issue, despite numerous references to ERISA in the plan document).

## E.

The Plaintiffs have challenged the finding of the trial court that "the cost of living adjustment; the phase out 30-and-out provision; the disability provisions; the rate of interest and the rate of employee contribution are all ancillary benefits subject to modification." They claim that Mr. Pennington "testified only that the disability benefit

- 15 -

was an ancillary benefit" and therefore, the finding by the trial court was not supported by Mr. Pennington's testimony.

The plaintiffs misstate Mr. Pennington's testimony:

Q: Did you say that the disability benefit in this 2001 plan document was an ancillary?

A: Yes, that's an ancillary benefit.

Q: Why did you conclude it was an ancillary benefit as opposed to a vested and accrued benefit?

A: Although the word ancillary is not defined in the plan document, in general, the accrued benefit, the monthly benefit at age 65 based on salary and service, you know, that's the accrued benefit. Other benefits that are not the accrued benefits, like the disability, life and death and so forth would be considered ancillary, not the primary benefit.

In contrast, the expert for the Plaintiffs testified that the 30-and-out provision, the COLA, and the lump sum option were vested, accrued benefits such that they could not be reduced by amendment.

The record clearly reveals that Mr. Pennington's position at trial, relied upon by the trial court, was that all benefits that were not the primary accrued benefit were ancillary benefits. Thus, the COLA, the 30-and-out provision, the disability provision, the rate of interest and the rate of employee contributions were not vested and accrued, and therefore were modifiable.

The Plaintiffs challenge the trial court's reliance on the testimony of the City's expert, Mr. Pennington. The court ultimately agreed with the position of Mr. Pennington and found in favor of the City. Findings that are related to the issue of credibility will not be disturbed by this court, absent other concrete evidence to the contrary showing that the trial court erred in its judgment of the veracity of the witnesses. *Farmers & Merchants Bank v. Dyersburg Prod. Credit Ass'n,* 728 S.W.2d 10, 18 (Tenn. Ct. App. 1986). Where the trial court's factual determinations are based upon its assessment of witness credibility, we will only overturn the rulings if clear and convincing evidence to the contrary is shown. *Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010). In the record before us, the Plaintiffs failed to identify any facts found by the trial court that show the court erred in finding that the City's expert was more credible than the Plaintiffs' expert. Accordingly, the Plaintiffs' argument is without merit.

Pursuant to *Blackwell* and the plan document, the court properly found that there

was no legal prohibition to amending the 2001 Pension Plan. Thus, the trial court's determination regarding the 2015 Pension Plan amendments was not illegal, arbitrary or capricious.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this cause is remanded for the collection of the costs below. Costs on appeal are taxed to the appellants, Aaron Jay Cryer and Jason M. Alexander.

_____
JOHN W. MCCLARTY, JUDGE